Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

RAMUNDO RUIZ,
    Plaintiff,
                       CIVIL ACTION
  vs.
                       FILE NO. 6:07-CV-56
U.S. PROTECT MICHAEL B.
MUKASEY, ATTORNEY GENERAL
OF THE UNITED STATES,

    Defendants.
_____


VIDEOTAPED DEPOSITION OF

DR. LOUIS CHELTON

ATLANTA HARTSFIELD JACKSON INTERNATIONAL AIRPORT

JULY 15, 2008/9:30 a.m.


REPORTED BY:
ANNA-MARIE CHEAK, RPR/CSR
ESQUIRE DEPOSITION SERVICES
ATLANTA OFFICE - 404-872-7890
FILE NO: 427409

Deposition of Dr. Louis Chelton

### Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

JOHN W. GRIFFIN, ATTORNEY AT LAW
Marek, Griffin & Knaupp
203 Liberty Street
Victoria, Texas 77901
361-573-5500

On behalf of the Defendant, Attorney General of the United States:

JIMMY A. RODRIGUEZ, ASSISTANT UNITED STATES ATTORNEY
United States Department of Justice
Southern District of Texas
919 Milam, Suite 1500
Houston, Texas 77208
713-567-9532

On behalf of the Defendant, U.S. Marshals Service:
C. JOSEPH CARROLL, ATTORNEY AT LAW
U.S. Marshals Service
Washington, D.C. 20010
202-305-9573

Also present: Derrick Jones, Certified Videographer

### Page 3

INDEX TO EXAMINATION

By Mr. Griffin.....page 6
By Mr. Rodriguez...page 126

INDEX TO EXHIBITS

Previously Marked                Initial Ref. Page
Plaintiff's Exhibit
No. 8....CSO Medical Standards - Hearing    25
    12/12/03
Defendant's Exhibit
No. 4....Letter to Judy Wimberly from Ramundo   131
    Ruiz, 3/23/06
No. 5....Letter to Judy Wimberly from Ramundo   117
    Ruiz, 6/12/06
No. 6....Judicial Security Division, Medical   73
    Review Form
Marked for this deposition:            Page
Plaintiff's Exhibit
No. 1.....Judicial Security Division, Medical   81
    Review Form
No. 2.....Letter to Lynn Cook from Gina Parks   124
    8/17/06
No. 3.....Document titled Hearing    36
    Nos. 24 - 29

### Page 4

Plaintiff's Exhibits Continued              Page

No. 4.....Composite, first page, Doctors Center,   87
    Current Audiogram
No. 5.....Judicial Security Division, Medical   56
    Review Form
No. 6.....Excerpts from Gunnels & Naquin vs   120
    Akal, et al Deposition
No. 7.....Report from Lynn E. Cook, Occupational   54
    Audiologist
No. 8.....Charge of Discrimination   57
No. 9.....Audiometric Examination   94
No. 10....Composite, first page, E-mail from   52
    Portia Troutman to Colin Murphy
    2/5/07
No. 11....Audiometric Threshold Shift   124
No. 12....FY Lookup for Audio for Rec ID:   119
    2194423
+++end exhibits+++
All Exhibits Listed Above Are Attached To Deposition

### Page 5

PROCEEDINGS
    VIDEOGRAPHER: This is Tape Number 1 in the videotaped deposition of Dr. Louis Chelton taken by the Plaintiff in the matter of Case Number 607-CV-56, Ramundo Ruiz versus U.S. Protect Michael B. Mukasey, Attorney General of the United States, to be heard in the United States District Court for the Southern District of Texas.
    The deposition is being held at the Crown Room Club located at Hartsfield International Airport, Atlanta, Georgia. Today's date is July 15, 2008. The time is approximately 9:31 a.m.
    The court reporter is Anna Cheak. The videographer is Derrick Jones on behalf of Esquire Deposition Services.
    Would Counsel and all present please introduce yourself, after which the Court Reporter will swear the Witness.
    MR. GRIFFIN: Good morning, I'm John Griffin. I represent Ramundo Ruiz.
    MR. RODRIGUEZ: Good morning, I'm Jimmy Anthony Rodriguez, and I represent

Deposition of Dr. Louis Chelton

Page 70

1  disqualification memos that you yourself signed.
2    A   Do you want me to name these pages?
3    Q   You don't have to at this point.  I just
4  want to confirm that the ones that got the flaggys
5  on them are the ones that you have signed yourself
6  with respect to CSOs who were disqualified for their
7  hearing impairments.
8        MR. RODRIGUEZ:  Do you have an extra
9     copy of this?
10       MR. GRIFFIN:  I do.  I apologize for
11    having duplicates of some of them, of the
12    pages in there.  I killed more trees than
13    I needed to and I'm duly repentant.
14   A   I've got one here where I don't see that
15 it is a disqualification, and actually, it appears
16 to be signed by Dr. Miller rather than me.
17 BY MR. GRIFFIN:
18   Q   Okay.  Well, take the flaggy off the one
19 that you didn't sign.  We don't need a flaggy on
20 anything that you didn't sign.  So thank you for
21 that.
22   A   And there are times when due to the number
23 of records we review, when he was over reviewing
24 mine and I made -- he wanted to do something
25 differently, he would print it out again and sign

Page 71

1  it, rather than bring it back to me and make me sign
2  it again, though he would let me know about the
3  change.
4    Q   Well, thank you for sharing that.
5    A   Yeah.  All of these signatures are my
6  signatures.
7    Q   Okay.  In the ones that you've signed, I
8  want to ask you about one of the things that you say
9  in these memos.  You say Law Enforcement Officers
10 must possess and maintain adequate hearing,
11 including the ability to hear soft sounds,
12 understand speech.
13       When you talk about Law Enforcement
14 Officers, who are you speaking of when you make
15 those statements in your memos?
16   A   In this memo, this is a -- what we call a
17 template, which is a set of canned verbiage that you
18 bring up, and then adjust to meet the exact needs of
19 the instance.  In this case, I'm referring to Court
20 Security Officers.
21   Q   Okay.
22       MR. GRIFFIN:  Let me object to the
23    responsiveness.
24 BY MR. GRIFFIN:
25   Q   I'm not really concerned about how you put

Page 72

1  your typewriting stuff in there and that sort of
2  thing.  I just want to know, when you say Law
3  Enforcement Officers must have adequate hearing
4  skills, which Law Enforcement Officers are we
5  talking about --
6    A   Well --
7    Q   -- that need good hearing skills, that
8  you're talking about here?
9    A   On this document, it refers to Court
10 Security Officers.
11   Q   But I thought you told me a half hour ago
12 that Court Security Officers are not Law Enforcement
13 Officers.  I thought you told me they were not, and
14 made a point to tell me that I was wrong in calling
15 them that; do you remember that?
16   A   Yeah.
17   Q   Is that true that you did correct me when
18 I called them Law Enforcement Officers?
19   A   Yes.  I said that we call them Security
20 Officers now, and that I've been asked to refer to
21 them as such, rather than Law Enforcement.
22   Q   How many years did you refer to -- how
23 many years in your memos did you refer to Law
24 Enforcement Officers insofar as the need for them to
25 be able to hear adequately?

Page 73

1    A   I don't know.
2    Q   Let me have you take a look at what has
3  been previously marked as Ray Ruiz Defendant's
4  Exhibit No. 6.  Do you have that before you?
5    A   Yes.
6    Q   Tell us what that is, if you don't mind,
7  please?
8    A   This is the Medical Review Form that
9  documents the statement of disqualification of
10 Mr. Ruiz for decreased hearing.
11   Q   Okay, let me just ask you this.  When you
12 talk about the -- with respect to Mr. Ruiz -- let me
13 just come around and make sure I'm looking at the
14 same page as you are.  Are these identical -- one of
15 these is signed here.
16       Now, tell me, earlier in the day, why it
17 was that you corrected me when I called the Court
18 Security officers, Law Enforcement Officers?
19   A   My understanding is that we've encountered
20 difficulty, because people have attempted to
21 construe the term Law Enforcement Officer as such a
22 broad term that it can, in some way that I don't
23 fully understand, imply a major life activity
24 disability, when that wasn't what we intended to
25 state.

19 (Pages 70 to 73)

Deposition of Dr. Louis Chelton

Page 74

1    So the term Security Officer refers more
2 directly to the Court Security Officer's position.
3 And what we're trying to indicate is that our
4 judgment is made with regard to this job and this
5 job only, not as a blanket statement about any other
6 job, but just the Court Security Officer job.
7    Q  So is that -- my question -- make sure I'm
8 understanding -- was that the reason why you
9 corrected me this morning when I called Court
10 Security Officers, Law Enforcement people?
11   A  Yes.
12   Q  But we agree that in the hundreds of pages
13 of your records, for years, you have called Court
14 Security Officers, Law Enforcement Officers, haven't
15 you?
16   A  Yes.
17   Q  Hundreds of times, right?
18   A  Yes.  I've used that phrasing in many,
19 many documents.
20   Q  Right, and -- it's okay if you do or you
21 don't, but you don't know whether -- well, let me
22 just ask you.  Within your expertise of Occupational
23 Health, do you think those six things that are
24 listed there on Exhibit -- is it 3, Dr. Chelton?
25   A  Yes.

Page 75

1    Q  Yeah, on Exhibit 3, do you have any idea
2 whether those six abilities to hear are important in
3 law enforcement or not?
4    A  I can only say with regard to Law
5 Enforcement Agencies where I know their standards.
6    Q  Which are those?
7    A  That to be TIGTA, the Treasury Inspector
8 General for Tax Administration, and for the Court
9 Security Officer Program.
10   Q  For the Special Agents for -- did you say
11 Treasury?
12   A  Yes.  Treasury Inspector General for Tax
13 Administration.
14   Q  But those were Special Agents, were they
15 not?
16   A  Special Agents.
17   Q  Yeah, GS-1811 Law Enforcement positions?
18   A  Correct.
19   Q  Are those six necessary hearing functions
20 for those Special Agents?
21   A  I don't have the Standards right in front
22 of me for that Agency, and I would hesitate to say
23 that I know these to be identical there.  These
24 were -- this set is generated specifically for the
25 Court Security Officer Program, and I can't say that

Page 76

1 they are identical to the ones that we require.
2    Q  If you can tell me yes, no, or I don't
3 know for each of those; for Special Agents for
4 Treasury, is it important that those Special Agents
5 be able to understand speech during face-to-face
6 conversations?
7    A  Yes, I think it is.
8    Q  And for those special agents at Treasury,
9 is it important they be able to understand speech on
10 the telephone?
11   A  Yes.
12   Q  Is it important for those Special Agents
13 to be able to understand speech on the radio?
14   A  Yes.
15   Q  Is important for those Special Agents to
16 understand speech even where they can't see another
17 officer?
18   A  Yes.
19   Q  Is it important for those Special Agents
20 to hear sound that require investigation?
21   A  Yes.
22   Q  Is it important for those Special Agents
23 to be able to know where sound is coming from?
24   A  Yes.
25   Q  Did someone ever instruct you not to call

Page 77

1 Court Security Officers Law Enforcement people in
2 your memos?
3    A  Yes.
4    Q  Who instructed you not to do that anymore?
5    A  A number of people.
6    Q  Who first?
7    A  I can't say that exactly, but I know
8 that -- I would be guessing, but I suspect that it
9 was probably Tom Galvan.  It may have been Joe
10 Carroll.  I don't know exactly.  It may have even
11 have been Dr. Miller -- one of them through him to
12 me.
13       I don't know.  I got that instruction that
14 this was problematic language, and it would be
15 better to call them Security Officers.
16   Q  Problematic in what sense?
17   A  In the sense that it was being used to
18 portray a picture of the judgment we were making,
19 which was not accurate; that we were making a
20 blanket judgment about law enforcement in general,
21 rather than a specific judgment about this
22 particular job, which we wanted to correct any
23 misunderstanding of that, or misrepresentation.
24   Q  How old a gentleman are you, sir?
25   A  I'm 57.

20 (Pages 74 to 77)

Deposition of Dr. Louis Chelton

Page 126

1   MR. GRIFFIN: I'll pass the Witness
2   at this time.
3   VIDEOGRAPHER: We're off the record
4   at 12:32 p.m.
5   (Recess from 12:32 to 12:41).
6   VIDEOGRAPHER: This is the beginning
7   of tape number three in the continued
8   deposition of Dr. Louis Chelton. We're on
9   the record at 12:41 p.m.
10   EXAMINATION
11  BY MR. RODRIGUEZ:
12   Q   Good afternoon, Dr. Chelton.
13   A   Hello.
14   MR. RODRIGUEZ: For the record, the
15   Defendants, and then Dr. Chelton, we'd
16   like to reserve his right to review and
17   sign the transcript.
18  BY MR. RODRIGUEZ:
19   Q   Dr. Chelton, you had discussed earlier how
20  you're not an Audiologist. What is your -- what is
21  the Field of Medicine in which you are an expert?
22   A   I am an expert in the application of
23  medical information to the specific job functions of
24  a Court Security Officer.
25   Q   Is it true that FOH, the Federal

Page 127

1  Occupational Health, is the Federal Government's
2  Expert Agency in the field of Occupational Medicine?
3   MR. GRIFFIN: Objection to form.
4   A   It is a -- as far as I know, it's the only
5  specific department that is specifically addressing
6  Occupational Medicine.
7  BY MR. RODRIGUEZ:
8   Q   And does the FOH through you provide
9  medical advice to the U.S. Marshal Service?
10   A   Yes.
11   Q   Now, why are CSOs not allowed to wear
12  hearing aids in order to meet the Minimal Hearing
13  Standards?
14   MR. GRIFFIN: Objection to form.
15   A   There are a number of reasons that I
16  understand that decision has been made that include
17  difficulties with the nature of the improvement that
18  hearing aids can provide.
19   That includes a limitation of the
20  frequency range that it reproduces, such that there
21  is a narrower range than the full range of human
22  hearing; that they also change the phase of the
23  sound waves as they reach the two ears, so that
24  directional localization in the horizontal plane is
25  interfered with hearing aids in place.

Page 128

1   They also, even the in-canal hearing aids,
2  change the reflection of sound off of the ears as it
3  passes down the canal, and this is important in
4  localization, up and down and front and back.
5   In addition to that, there are problems
6  with malfunction. They can malfunction. They can
7  be poorly maintained. They can be left out by
8  accident. In addition to that, there's the
9  possibility of dislodgement in the course of a
10  aggressive interaction with a perpetrator, for
11  example.
12   In the sum total of all of these risks --
13  oh, and I should add one more thing, and that is
14  that the difficulty of trying to monitor the range
15  of different kind of hearing aids available and the
16  regular checking necessary to make certain that they
17  would remain in functional order is very -- would
18  seem extremely demanding.
19   As a total picture, all of those things
20  taken together, it's my understanding that the
21  Marshal Service made the decision not to allow
22  hearing aids to replace adequate hearing without
23  them. I think that explains it.
24  BY MR. RODRIGUEZ:
25   Q   So why would -- why does the Marshal

Page 129

1  Service, and through the assistance of FOH, allow
2  some CSOs to wear hearing aids on the job but then
3  not allow them to wear hearing aids to meet the
4  minimal standards?
5   MR. GRIFFIN: Objection to form.
6   A   The Marshal Service -- and again, this is
7  my understanding, the Marshal Service wants to be
8  certain that under any circumstances there is
9  baseline unaided hearing that will be adequate to
10  function in the job.
11   They do not, however, feel that they can
12  say with any clarity that the overall effect of
13  hearing aids will diminish the quality of hearing.
14  So they leave this judgment to the Court Security
15  Officer to say if you feel that ultimately you hear
16  better, all things considered, we trust your
17  judgment in that.
18   However, you must pass without them, so
19  that we know you can function if it malfunctions or
20  gets knocked out or you remove it, because you can't
21  tell the location of a sound.
22  BY MR. RODRIGUEZ:
23   Q   Why would Mr. Ruiz's hearing condition
24  present a risk to the Courthouse and Courthouse
25  Security?

33 (Pages 126 to 129)